A92A0709. CONTINENTAL RESEARCH CORPORATION v. REEVES et al.
(419 SE2d 48)

BIRDSONG, Presiding Judge.

Appellant Continental Research Corporation (CRC) appeals from a judgment entered in favor of appellees in a products liability case involving inter alia allegations of improper labeling and a claim for loss of consortium, and from an order denying appellant's motion for new trial.

Appellee Ed Reeves, who specializes in heating, ventilation, air conditioning and refrigeration repair, was injured when he accidentally sprayed Con-Coil air conditioner cleaner inside a glove and got

the product on his hands. Con-Coil contains a hydrofluoric acid and this fact was known to Mr. Reeves. Following the accident, Mr. Reeves read the warning label on the product, and promptly washed his hands and gloves with water; he also washed his hands thereafter repeatedly with soap and water. Mr. Reeves continued to work throughout the day and after a period of time, his hands became red and irritated. He went home and informed his wife of the incident. Mr. Reeves' condition worsened during the evening and his hands became increasingly painful notwithstanding various home remedies. Mrs. Reeves' concerns mounted. She read the label on the Con-Coil bottle and, remaining unsatisfied, called Poison Control. Mrs. Reeves was advised to take her husband for emergency medical treatment without delay. The local medical facility was unfamiliar with the nature of Mr. Reeves' injury and he was referred to a larger facility. Ultimately, he was injected with a medication used to counteract the hydrofluoric acid. Mr. Reeves sustained permanent damage to his hands.

The Con-Coil label did not specifically advise a person to seek medical treatment immediately if his skin came in contact with the product. Neither did the label warn the user that Con-Coil contains a fluoride ion which can cause the substance to penetrate the skin rapidly, and can result in severe injury below the outer skin surface without causing any visible burning, corrosion or damage to the surface of the skin. The need for these warnings was contested. The label did include, inter alia, a graphic. The lower diagonal of the graphic contained the word "CORROSIVE," and the top diagonal contained two pictorial representations, including a depiction of a hand being eaten away when coming into contact with a substance poured from a vial. The written label stated the product contained certain "HAZARDOUS MATERIAL," including hydrofluoric acid. It also warned that skin contact can cause severe burns, and to "wash thoroughly with water for both eyes and skin contact. Get medical aid if necessary." Additionally, the label stated, "it is not harmful to equipment (aluminum or cooper) when used as directed." Appellees in essence maintain that the label misled Ed Reeves and lulled him into failing to seek immediate medical attention, which would have prevented the permanent injury he sustained. Appellees introduced expert testimony that hydrofluoric acid could penetrate the skin and cause damage below the surface without being apparent to the person injured. The expert also testified that once contact occurred with hydrofluoric acid it was important to obtain immediate medical attention as the damage can be stopped only by the injection of calcium gluconate or other neutralizing substance; and, that while soap and water will neutralize the acid on the skin surface area to some extent, it cannot neutralize acid that has deeply penetrated and that does require specific emergency

treatment. Although these contentions were strongly contested, the jury resolved contested issues of fact and rendered a verdict in favor of appellee/plaintiffs. *Held*:

1. Appellant, a foreign corporation, asserts it was not subject to personal jurisdiction of the court under the Long-Arm Statute of this state and for want of sufficient "minimum contact" to satisfy due process requirements. In resolving this jurisdictional issue, this court may consider all relevant evidence wherever located in the trial record.

At the time of his injury in Georgia, Ed Reeves lived and worked in Georgia; he and his wife subsequently moved to Texas to be close to her relatives. At the time of suit they were Texas residents. CRC is in the business of manufacturing chemical solvents which it sells to air conditioning wholesalers through manufacturers' representatives. CRC has no registered agent for service of process in Georgia, and has no office, no employees and no property in Georgia. The Con-Coil in question was purchased by Ed Reeves from a Baker Brothers store in Georgia. CRC apparently shipped the Con-Coil originally to its wholesale customer, Baker Brothers of Jacksonville, Florida. CRC officials were aware that Baker Brothers had six or more outlet stores in Georgia, and CRC was aware that Con-Coil would be sold in Georgia. In the normal course of business, CRC sells its products through manufacturer's representatives who are given a territory. One of those representatives had a territory that included the states of Georgia and Florida. Although CRC does not sell its product directly to individual users in Georgia, a CRC manufacturers' representative sells and promotes Con-Coil sales to customers in this state, and CRC receives the income from the sale of its products in Georgia. Products are shipped to wholesale customers by CRC and this includes shipments of products to customers in Georgia; however, title to the products transfers to customers at CRC's shipping dock in Dallas, Texas. Rather than billing the manufacturers' representative for products shipped, CRC invoices the customer and the customer pays CRC directly; CRC then pays the representative his commission. CRC does advertise in certain so-called national publications, but does not advertise in any publications that are exclusively for the Atlanta or Georgia area. CRC wants its product sold nationwide, including sales in Georgia, and it is not merely coincidental that its products are sold in this state. CRC manufacturers' representatives take steps to see that the product is sold in Georgia, and CRC instructs the representatives to take steps to so sell the product. CRC wants the manufacturers' representatives to sell as much of the product as they can in Georgia. CRC has gross sales of about $1,500,000; however, CRC sells less than three percent of the gross sales of its products in Georgia so its president does not consider shipments to be made regularly to the state. It may be reasona-

bly inferred that as CRC sells less than three percent of its gross sales of products in Georgia, it perforce sells more than two percent of such gross sales in this state. Therefore, it may reasonably be concluded that CRC sold annually between $30,000-$45,000 worth of products in Georgia and, in our view, this would constitute "substantial revenue" from CRC goods used or consumed within this state, within the meaning of OCGA § 9-10-91 (3).

The manufacturers' representative contract CRC entered with Mr. Dunbar in January of 1985 was to sell and promote CRC's products to wholesale distributors exclusively in a seven-state area, including both Florida and Georgia. CRC considers these manufacturers' representatives to be independent contractors who may represent other product lines as well and asserts it cannot tell them what to do or require them to give technical data sheets about Con-Coil to their wholesale customers. The representatives are paid a commission on all orders received within their territory whether submitted to CRC by the representative or submitted directly from an area distributor. The contract specified that representatives were independent contractors. It also provided the manner in which commissions would be determined, and granted the company the absolute right to set product prices and the terms governing the sales of CRC products.

Appellant asserts that it was not doing business in Georgia within the meaning of the Long-Arm Statute, OCGA § 9-10-91. OCGA § 9-10-91 pertinently provides: "A court of this state may exercise personal jurisdiction over any nonresident or his executor or administrator, as to a cause of action arising from any of the acts, omissions, ownership, use, or possession enumerated in this Code section, in the same manner as if he were a resident of the state, *if in person or through an agent*, he: . . . (3) Commits a tortious injury in this state caused by an act or omission outside this state if the tort-feasor *regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed* or services rendered in this state. . . ." (Emphasis supplied.) The Long-Arm Statute of this state contemplates that jurisdiction shall be exercised over nonresident parties to the maximum extent permitted by procedural due process. *Coe &c. Co. v. Wood-Mosaic Corp.*, 230 Ga. 58, 60 (195 SE2d 399). Regarding the term "agent" in OCGA § 9-10-91 and in the "minimum contact" context hereinafter discussed, "we are not . . . dealing with the traditional 'principal-agency' theory of respondeat superior. We are concerned with whether a forum state may exercise personal jurisdiction over a nonresident defendant based upon the 'minimum contact' theory of *International Shoe Co. v. State of Wash.*, 326 U. S. 310 (66 SC 154, 90 LE 95). '(W)ith the liberalization of the due process criteria [cit.], the jurisdictional distinction between agents and independent con-

tractors has begun to fade. Courts treat persons who derive commission revenue [such as the manufacturers' representative in this case] not in terms of agents or independent contractors, but they view their activities and status, in a realistic commercial light.' " *Hollingsworth v. Cunard Line,* 152 Ga. App. 509, 513 (263 SE2d 190). The issue is, can appellant CRC place its products in the stream of commerce with the intent of achieving nationwide sales and conduct its commercial activity in support of its sales goals through a contractual process with an independent contractor (who, in accordance with CRC sales policy, promotes the establishment of new distributors and sells CRC products to distributors in various states including both Florida and Georgia) and thereby insulate itself from the jurisdiction of our courts, even though CRC's out-of-state tortious acts or omissions result in injury within this state, merely because it has maintained a substantial portion of its business contact through the self-chosen medium of an independent contractor. We hold that CRC cannot. Clearly Con-Coil has been placed in the stream of commerce by CRC in various states, including Georgia and Florida. "In our opinion, this systematic and purposeful activity establishes that [CRC], through [its independent contractor, manufacturers' representative] 'engages in (a) persistent course of conduct, or derives substantial revenue from goods used or consumed . . . in this state.' OCGA § 9-10-91 (3). The sale of goods in another state, knowing that they will be resold in Georgia, is a purposeful activity sufficient to establish a 'contact' with Georgia. See *Shellenberger v. Tanner,* 138 Ga. App. 399, 412 (227 SE2d 266)." *Showa Denko v. Pangle,* 202 Ga. App. 245, 247 (1) (414 SE2d 658). Compare *Coe &c. Co.,* supra (statement of facts at *Coe &c. Co. v. Wood-Mosaic Corp.,* 125 Ga. App. 845 (189 SE2d 459) and *Timberland Equip. v. Jones,* 146 Ga. App. 589 (246 SE2d 709).

Regarding the question of due process, appellant, relying on the plurality opinion of *Asahi Metal Indus. Co. v. Superior Court of Cal.,* 480 U. S. 102 (107 SC 1026, 94 LE2d 92), and certain of its lower court progeny, asserts that the "minimum contacts" necessary to satisfy due process requirements have not been met. However, "[j]ust as other courts have done, we conclude the 'splintered view of minimum contacts in *Asahi* provides no clear guidance on this issue,' (*Irving v. Owens-Corning Fiberglas Corp.,* 864 F2d 383, 386 (5th Cir. 1989)) and we choose to apply the stream of commerce analysis set forth by the United States Supreme Court in *World-Wide Volkswagen,* [444 U. S. 286 (100 SC 559, 62 LE2d 490)] to the facts at hand." *Showa Denko,* supra at 250. According to *World-Wide Volkswagen,* supra at 297, whether the introduction of a product into the stream of commerce establishes minimum contacts with a state in which the product is ultimately sold depends on the foreseeability that the product would be sold there; however, the foreseeability that is critical to due pro-

cess analysis is not the mere likelihood that the product will find its way to the forum state, rather it is that " 'the defendant's conduct and connection with the forum [s]tate are such that he should reasonably anticipate being haled into court there.' " *Showa Denko*, supra at 248 (2). But, in *World-Wide Volkswagen*, supra at 297-298, the United States Supreme Court recognized that "[t]he forum [s]tate does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum [s]tate." In this case plaintiff Ed Reeves purchased and used appellant's product in Georgia as a result of appellant's deliberate and purposeful nationwide distribution attempts, including its express targeting of Georgia as an area for the establishment of distributorships and sale of its product by its independent contractor manufacturers' representatives. When, as here, a manufacturer from another state sells its product, particularly one with a hazardous potential, to a wholesaler customer from Florida knowing that its product will ultimately be sold in that customer's wholesale outlets in Georgia, "it should reasonably expect to be haled into court in Georgia for an injury caused in this [s]tate by that product." *Showa Denko*, supra, 248. Compare *Timberland Equip.*, supra at 590 (1).

Incidentally, the terms of CRC's contract with the manufacturers' representatives for the southern areas, including Georgia and Florida, pertinently provides that: "The company [CRC] reserves the right to direct or conduct, at its own expense, the defense of any suit brought against the *Representative* by a third person for alleged damage to person or property as a result of use of the Company's products." At a minimum, this provision is indicative of CRC's determination that, under the proper circumstances, it would not consider it too onerous to submit to the jurisdiction of the court suing its manufacturers' representative in order to protect its own economic interest and the integrity of the product.

Under the attendant circumstances, we conclude that CRC should have reasonably anticipated being haled into court in Georgia. Moreover, in view of CRC's systematic and purposeful use of manufacturers' representatives and wholesale distributors to promote and expand its product sales nationwide, including within the boundaries of this sovereign state, we further find that this case would meet the standards for "minimum contacts" established by the plurality in *Asahi* in addition to those of *World-Wide Volkswagen*. Compare *Showa Denko*, supra at 249. Accordingly, we find that, under either theory of "minimum contact," the trial court had the requisite personal jurisdiction over appellant in this case.

2. Appellant asserts the trial court erred in excluding defendant's

exhibit no. 10, "Symbols for Industrial Safety [NIOSH]." The symbol discussed in the offered exhibit was somewhat similar to but not identical to the corrosive symbol employed in the case at bar. The admission of evidence generally rests in the sound discretion of the trial court. *Gene Thompson Lumber Co. v. Davis Parmer Lumber Co.*, 189 Ga. App. 573, 575 (2) (377 SE2d 15). Viewing the document in its totality, we cannot conclude that the trial court abused its discretion in refusing to admit this exhibit.

Further, appellant asserted in support of its enumeration of error that this exhibit "demonstrated that the National Institute for Occupational Safety and Health had studied and determined that the particular pictogram . . . on defendant's product was *the most effective communicator of the hazard*." (Emphasis supplied.) However, one of appellee's expert witnesses testified affirmatively at trial, by way of deposition, that the diamond symbol that says "corrosive" with those two pictures (of a hand and a rod being eaten by a substance poured from vials) has been passed on by just about everybody as being the best message-giver of a corrosive material. As the pertinent testimony of appellee's expert conveyed substantially the same information to the jury as contained in the relevant portions of defendant's exhibit no. 10, we are satisfied that had any error occurred in failing to admit the exhibit, such error would be harmless within the meaning of OCGA § 9-11-61. *Nalley Motor Trucks v. Cochran*, 200 Ga. App. 487, 488 (408 SE2d 501); see *Chester v. State*, 162 Ga. App. 10, 14 (290 SE2d 117) (concurring opinion).

3. Appellant asserts the trial court erred in refusing to charge the "open and obvious danger" defense as requested in defendant's requests to charge nos. 8 and 9. Appellant excepted to the refusal to give these charges on the basis that the "open and obvious" defense is separate from contributory negligence and different than assumption of the risk, as it is not based upon whether Mr. Reeves knew, but whether "a generic person such as Mr. Reeves should have seen this open and obvious danger." Pretermitting the accuracy of appellant's argument is the issue whether his charge requests were adequately adjusted to the evidence and did not create a fair risk of confusing or misleading the jury. Examination of the defendant's requests to charge nos. 8 and 9 reveals that the requested charges are not adequately adjusted to the evidence. Although the language used by appellate courts in a decision may embody sound law, it is not always proper to employ such language in a charge to the jury. *Department of Transp. v. Hillside Motors*, 192 Ga. App. 637, 640 (3) (385 SE2d 746). For example, an unadjusted instruction may in view of the other charges given appear ambiguous and mislead the jury as to its application in view of the attendant facts. "A request to charge itself must be correct, legal, apt, even perfect, and precisely adjusted to some

principle involved in the case. If *any portion* of the request is inapt or incorrect, denial of the request is proper." (Punctuation omitted.) *Mattox v. MARTA*, 200 Ga. App. 697, 699 (4) (409 SE2d 267). The posture of the evidence of this case, unlike that in *Weatherby v. Honda Motor Co.*, 195 Ga. App. 169, 173 (393 SE2d 64), reflects a factual controversy regarding whether the actual peril confronting Ed Reeves was open and obvious. The existence of any defense based upon the alleged open and obvious nature of the peril was a question for the jury, and the instruction would have to be adjusted to reflect adequately this distinction. For example, the requested charges failed to inform the jury of their duty to determine whether an open and obvious peril existed under the attendant facts. Neither do the charge requests adequately and clearly inform the jury of the legal significance between a factual determination by them whether the peril was latent or patent. It is not error to refuse a charge request that is incomplete. *Michelin Tire Corp. v. Crawford*, 170 Ga. App. 359, 360 (1) (317 SE2d 336).

Additionally, a fair risk exists that the request for charges, as crafted and presented to the trial court, could confuse or mislead the jury into concluding that the trial court had found the danger in fact was open and obvious, and thus that they were required to apply the so-called "open and obvious" rules to the exclusion of the pertinent affirmative defenses charged. The requests for instruction also were confusing as they did not attempt to distinguish this rule adequately from that of the applicable affirmative defenses of which the jury was charged. Thus, *Weatherby*, supra at 171, admonishes that: "Care should be taken to distinguish between the 'open and obvious rule' and the affirmative defenses [when charged] of contributory and comparative negligence and assumption of the risk. . . . While the 'open and obvious rule' imposes on a plaintiff the burden of proving that the peril-causing injury is latent, or not patent, the affirmative defenses of contributory and comparative negligence and assumption of the risk require a defendant to prove that a plaintiff's conduct was unreasonable under the circumstances or that plaintiff knowingly encountered a known danger with appreciation thereof. Thus, *jury questions* are often presented as to whether the affirmative defenses have been established." (Emphasis supplied.) Without a tailored instruction which adequately distinguished the "open and obvious" rule from the applicable affirmative defenses, defendant's request to charge nos. 8 and 9 ran a fair risk of both confusing and misleading the jury. The trial court does not err when it refuses to give a request for charge which, as crafted, creates a fair risk of confusing or misleading the jury when examined in light of the other charges given. See *Jones v. State*, 200 Ga. App. 519, 521 (2 c) (408 SE2d 823).

4. Appellant asserts the trial court erred in refusing to charge de-

fendant's request no. 15, "pertaining to the nature of the risk needed to be appreciated under assumption of risk," after the court had advised counsel the requested charge would be given and defense counsel had argued the case to the jury based upon that information, and the court, thereafter, refused to give the charge.

(a) The charge conference has not been transcribed and attached to the trial record for our examination. Following the charges to the jury, appellant's counsel took exception to the failure to give charge request no. 15. Appellant asserted that the charge contained a key issue in the case that plaintiff need not know the precise nature of the hazard presented; it is sufficient that he be aware of the hazards in general. Appellant further asserted, "I was under the impression — that could have been in error — that the court was going to charge this." The trial judge in essence stated on the record that he had gone through the charge requests carefully, had selected the charges he was going to give, and if the court had indicated to counsel the charge would be given it was sorry, as he did not mean to mislead counsel. Appellant thereafter did not contest this explanation on the record. Accordingly, the record before us does not affirmatively establish, as argued by appellant, that the trial court in fact had informed appellant before argument that charge request no. 15 would be given. Without a transcript of the charge conference before us, we cannot resolve this matter. Accordingly, we must presume that the trial court did not erroneously inform appellant that this particular charge would be given verbatim. See generally *Nodvin v. West*, 197 Ga. App. 92, 97 (3 c) (397 SE2d 581); *Hunnicutt v. Hunnicutt*, 182 Ga. App. 578, 579 (356 SE2d 679).

(b) Defense charge request no. 15 is based on *Whirlpool Corp. v. Hurlbut*, 166 Ga. App. 95, 101 (5) (303 SE2d 284), which constitutes physical precedent only. *McCurley v. Whitaker Oil Co.*, 193 Ga. App. 527, 529 (388 SE2d 412). It is asserted in defense request no. 15 that if plaintiff was *generally aware* the use being made of the product was dangerous he cannot recover from the defendant under either a theory of *strict liability* or under a theory of negligence, and informed the jury that it was not important that plaintiff knew the precise physical nature of the hazard presented.

A party's failure to exercise ordinary care to discover the danger is not properly a matter of assumption of the risk, but of the defense of contributory negligence. *Beringause v. Fogleman Truck Lines*, 200 Ga. App. 822, 824 (4) (409 SE2d 524). Contributory negligence is not a defense to a claim of strict liability for product-caused harm. *Deere & Co. v. Brooks*, 250 Ga. 517, 518 (1) (299 SE2d 704). Viewing this request to charge in light of the charges actually given and the conflict in the evidence regarding the latent nature of the peril giving rise to the injury, there exists a fair risk that the jury would be confused

and misled to believe that contributory negligence is a defense to a claim of strict liability for product-caused harm. Accordingly, the trial court did not err in electing not to give this charge as crafted. *Mattox*, supra; *Jones*, supra.

5. Appellant asserts, consistent with the exception taken at trial, that the trial judge erred in giving plaintiffs' request to charge no. 22, as it was not a statement of Georgia law, and by instructing the jury to "assume" defendant had certain knowledge and information, it relieved plaintiffs of their burden of proof. The specific grounds advanced at trial for objection or exception to a charge control the extent of appellate review of the charge. *Clemons v. Atlanta &c. Institute*, 192 Ga. App. 399 (1 a) (384 SE2d 881). The charge was a correct expression of Georgia law per se, as stated and adopted in *Greenway v. Peabody Intl. Corp.*, 163 Ga. App. 698, 700 (1) (294 SE2d 541), cert. den. Examining the charges in their totality to determine if the contested charge contains error (*Clemons*, supra at 401 (1 b)), as alleged, we conclude that the charge would not shift the burden of proof in the minds of jurors of ordinary understanding. It is not necessary in considering a charge to assume a possible adverse construction, but a charge that is sufficiently clear to be understood by jurors of ordinary understanding is all that is required (*Purdy v. Quinn*, 104 Ga. App. 385, 387 (121 SE2d 699)); and, a charge, which when viewed with all the charges given, substantially presented issues in such a way as would not likely mislead the jury even though a portion thereof may not be as clear and precise as could be desired, will not prompt a reviewing court to disturb a verdict amply authorized by the evidence (as is the verdict in this case). *Taylor v. State*, 195 Ga. App. 314, 315 (1) (393 SE2d 690).

*Judgment affirmed. Andrews, J., concurs. Beasley, J., concurs specially.*

BEASLEY, Judge, concurring specially.

I concur in all except the statement in Division 4 (b) for which *Beringause v. Fogleman Truck Lines*, 200 Ga. App. 822, 824 (4) (409 SE2d 524) (1991), is cited. See the dissent in that case.

DECIDED APRIL 30, 1992.

*Swift, Currie, McGhee & Hiers, Stephen L. Cotter, Jonathan M. Engram*, for appellant.

*Freeman & Hawkins, William H. Major III, Edwin L. Hall, Jr.*, for appellees.